COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| CITY OF EL PASO, | § | |
| | | No. 08-10-00143-CV |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | County Court at Law Number Five |
| ALAN PARSONS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 2007-4718) |
| | § | |

**O P I N I O N**

Alan Parsons, Appellee, and the Training Chief for the El Paso Fire Department (fire department), filed suit against the City of El Paso, Appellant, for violations of the Texas Whistleblower Act. TEX. GOV'T CODE ANN. § 554.002 (West 2004). The trial court rendered judgment on the jury's verdict in favor of Chief Parsons and awarded to him attorneys' fees among other sums. The City appeals asserting that: (1) there is no or insufficient evidence of a causal connection between Chief Parsons' report and the action taken against him; (2) Chief Parsons failed to establish an adverse personnel action; and (3) the trial court erroneously awarded attorneys' fees to Chief Parsons, who allegedly failed to timely designate an expert witness to testify regarding such fees.

**BACKGROUND**

Because both the legal and factual sufficiency of the evidence to support the jury's verdict is at issue, an extended recitation of the facts presented at trial is necessary.

Chief Parsons became an employee of the City of El Paso's Fire Department in 1982. There, Chief Parsons served as a fire fighter, fire suppression technician, lieutenant, and captain. In 2002,

Chief Parsons was promoted to Training Chief of the training academy, and he was the only member of the fire department to earn "Instructor 3" status, the highest level of certification available to an instructor through the Texas Commission on Fire Protection. Chief Parsons received many favorable evaluations and some of those evaluations were received from Fire Department Chief Roberto Rivera.

As Training Chief, Chief Parsons' duties at the training academy included: (1) conducting the basic firefighting school for probationary employees; (2) conducting general and specialized training classes in all areas of firefighting and fire prevention; (3) training command personnel in the proper techniques of firefighting and fire prevention; (4) coordinating all training programs; (5) grading recruits and making recommendations as to the capacity of probationary employees to qualify for permanent status; (6) issuing protective clothing; (7) supervising care and maintenance of fire academy grounds; (8) keeping training records; (9) giving and grading examinations to recruits and other personnel; (10) working with personnel-department employees on civil service examination materials; (11) and responding to multiple alarm fires.

Chief Parsons was also responsible for providing required, on-going training to all fire personnel to enable them to meet their continuing education requirements as established by the Texas Commission on Fire Protection (TCFP).[1] The TCFP regulates the number of continuing-education hours that fire personnel must attend in order for a fire department to be certified under its regulations. The TCFP also conducts enforcement activities such as audits, determining compliance or non-compliance, making findings, and levying fines. In October of every year, the City of El

---

[1] The Texas Commission on Fire Protection is a governmental body that regulates fire-department practices in Texas and certifies fire departments' compliance with TCFP standards.

Paso's Fire Department submits a certificate of renewal to the TCFP, which allows the City's fire personnel to be re-certified.

While Chief Parsons was required to provide training for the fire department, he was without authority to require fire personnel to participate in the required training. When fire-department personnel failed to comply with the necessary continuing education, he followed the department's procedure and presented the issue to an immediate supervisor and at staff meetings. Chief Parsons specifically submitted to Assistant Chief Marron a list of the personnel who were deficient in their annual physicals and repeatedly reported to Fire Chief Rivera and other division heads during monthly meetings, including one conducted on or about April 4, 2007, the issue of the fire department's on-going non-compliance with continuing education requirements. Assistant Chief Marron was in the chain of command between Chief Parsons and Fire Chief Rivera, and Chief Parsons relied on Assistant Chief Marron to pass reported information up to Fire Chief Rivera, as required by the Fire Department's chain of command. After Chief Parsons created a report on each individual within the department who was lacking their annual physical exam, he provided the reports to Assistant Chief Marron, with whom he discussed the deficiencies. Assistant Chief Marron showed the reports to Chief Surface, who threw the reports away. Chief Parsons continued to bring the non-compliance issue to the attention of Fire Chief Rivera during staff meetings. In October 2006, Fire Chief Rivera submitted to the TCFP a false certificate of renewal asserting that the City's Fire Department had complied with the agency's requirements, including the continuing-education requirements. Chief Parsons testified that in April 2007, based on past experience, he anticipated that the TCFP would be coming to the fire department soon, and he notified two fire department chiefs that the only way to resolve the fire department's non-compliance issue would be to notify the

3

TCFP of the fire department's non-compliance with continuing education requirements. Chief Parsons then notified TCFP's Jake Soteriou of the violations sometime in April 2007. After providing this information, TCFP conducting an inspection of the fire department, and a TCFP representative, Mr. Renfro, met with Chief Parsons during the audit. Chief Parsons informed Renfro that fire department personnel were not completing their required continuing education requirements, that the employees and citizens were at risk as a result, and that he needed Renfro's assistance because his efforts to resolve the issue within the Fire Department had been unsuccessful. Chief Parsons testified that he also told Renfro that Fire Chief Rivera had signed the certification of renewal while knowing that the fire department was not in compliance with regulations. Chief Parsons provided Renfro with the records he requested as part of the audit.

On May 31, 2007, the TCFP issued a letter stating that its audit of the City's fire department had revealed violations, which included, among other violations, the fire department's repeat violations of its continuing-education requirements since 2003 and Fire Chief Rivera's submission of a falsified certificate of renewal. The TCFP informed the City's Fire Department that it was subject to an administrative penalty of $1,000 per violation for each of the 218 violations of Texas Government Code Chapters 419.032 and 419.041 found during the April 2007 compliance inspection.

Sometime after the TCFP's findings were disclosed in May 2007, Chief Parsons was directed by Chief Calderazzo to contact Assistant City Attorney Ernesto Rodriguez, who had been working with Fire Chief Rivera and other chiefs to prepare a response to the violations and fines. In mid-June 2007, Chief Parsons informed Assistant City Attorney Rodriguez of the fire department's non-compliance with continuing education, that Fire Chief Rivera had filed the certificate of renewal

4

while knowing that the department was not in compliance, admitted that he had informed the TCFP of the violations, and testified at trial that he fully expected Rodriguez to inform Fire Chief Rivera that he had been the person who had notified the TCFP of these violations. Sometime after the inspection, Chief Marron entered Chief Parsons' office at the training academy and commented that the "prophecy [is] coming true."

On July 10, 2007, Fire Chief Rivera and Assistant City Attorney Rodriguez traveled to Austin to negotiate a reduction in the TCFP fines and Fire Chief Rivera issued a memorandum to the TCFP noting that Assistant Chief of Legislation Manuel Chavira would serve as the primary point of contact for TCFP inspections in the future, that the Fire Department would be recommending for inclusion in the City's fiscal year 2009 budget a training technician for the training academy to assist in monitoring training documentation, that the Fire Department would convert its training data to a new software program to more easily record and track continuing education training, and noted that the corrective measures to address the violations would cost the City $149,826.

Three days later, on July 13, 2007, Battalion Chief Ramiro Rios, whose rank is subordinate to a Chief, prepared a memorandum complaining of Chief Parsons' alleged misconduct occurring several months earlier, in March and April 2007, when Battalion Chief Rios had been reassigned to the training academy for eight weeks, and delivered it directly to Fire Chief Rivera, an act which failed to follow the chain of command.[2] Four days thereafter, on July 17, 2007, Chief Marron posted training academy vacancies without consulting Chief Parsons, which was not the normal procedure

---

[2] The Fire Department's Administrative Procedures specify that an incident report is a record of an incident involving a member of the fire department which may result in disciplinary action but a subordinate is not permitted to initiate an incident report on a supervisor. The Procedures also provide that upon the filing of an incident report, the member and the involved officer may be required to confer with the Fire Chief to fully discuss the matter and the Fire Chief or an Assistant Fire Chief determines the disposition of the matter.

before making significant changes in personnel at the training academy. On July 23, 2007, Chief Marron informed Chief Parsons that Fire Chief Rivera permanently transferred Chief Parsons out of the training academy, explaining that the academy was moving in a "different direction" and it was the Fire Chief's prerogative to transfer people as he saw fit. Chief Marron also told Chief Parsons there was an investigation being conducted but did not tell Chief Parsons what the investigation was about nor informed him to speak with an investigator or superior officer about the investigation. Chief Parsons thereafter reported to the logistics section at Fire Department headquarters.

Chief Parsons had not been informed that there was anything wrong with his operation of the training academy, had not been questioned about any of his work at the academy, and was not informed of any investigation that may have existed until after he had been transferred from the training academy to headquarters. The investigation regarding Chief Parsons' March and April 2007 conduct did not commence until after Chief Parsons was transferred from the training academy. Fire Chief Rivera did not meet with Chief Parsons to discuss what changes he wanted to make at the training academy nor shared any concerns that he may have had regarding Chief Parsons' training academy operations. After July 23, 2007, Chief Marron instructed Battalion Chief Carmona, a lower-ranked officer than Chief Parsons, that he would be in charge of the training academy and instructed Chief Carmona that Chief Parsons was to have no contact with the trainees.

After his transfer from the training academy to headquarters, although Chief Parsons retained the title of "Training Chief" and received salary increases, he was not permitted to function as a training chief, personnel were transferred away from Chief Parsons' supervision without consulting him, and he was not permitted to bring his training academy files to headquarters. Chief Parsons'

6

office at headquarters was "a huge closet" where weapons-of-mass-destruction equipment were stored. The office contained a folding table and chair with no phone or computer. While over the first few months Chief Parsons initially developed standard operating procedures that were relevant to the operation of the training academy as requested for the TCFP, Chief Parsons testified that he was not allowed to carry out his Training Chief duties to determine "areas" for training programs, conduct basic firefighting school nor general or specialized training classes in firefighting or fire prevention, was not permitted to train command personnel in proper firefighting techniques, and was not permitted to keep training records or issue protective clothing. Chief Parsons was not permitted to respond to multiple-alarm fires, was told not to be involved in many of his primary duties such as grading recruits, and was provided no direction. He was given no subordinates to supervise and was stripped of his ability to exercise leadership in training fire personnel, despite receiving a raise and his title of "Training Chief." When asked if he could have performed many of his Training Chief duties, Chief Parsons repeatedly answered that although he could have performed his duties, he was not permitted to perform them.

One week after Chief Parsons' transfer, Chief Marron and Chief Talavera provided to Chief Parsons two incident reports which Chief Marron had prepared on July 27, 2007 and July 30, 2007, and which described the two events that occurred in March and April 2007. The March 2007 incident involved a middle school student who was visiting the training academy with her class and became ill when participating in doing "towers" as part of a program designed to allow students to experience a typical day for new fire department recruits. Although attended by a paramedic, the child needed no medical attention and was later seen laughing. The investigation revealed that no parents, teachers, or students complained about the March 2007 incident, and in August 2007, the

school's program coordinator issued a letter praising both Chief Parsons and the training academy program over the preceding four years, noting that the coordinator had never received a complaint nor had their ever been a medical issue in relation to the physical activity conducted at the training academy. Other coordinators, educators, and a parent also wrote letters stating that their students' visits to the training academy over several years had been safe and satisfying. Joseph Savage, a former Training Chief with the fire department who was then employed at a local high school noted that during his students' visits to the training academy over a six-year period, no student had suffered injury or illness, and stated that the students' well-being and safety had always been paramount to Chief Parsons. Chief Talavera, who was conducting the investigation, recommended that no action be taken against Chief Parsons regarding allegedly ill middle-school student incident, and although Chief Parsons was not disciplined, he was not transferred back to the training academy. Fire Chief Rivera stated in the disposition that he wanted the program "revisited," with signed releases for any hands-on activities, and that he preferred that "towers" be limited to high school students.

The April 2007 incident involved Chief Parsons asking a recruit to enter a body bag for one minute to illustrate to other recruits what could happen if they were careless in communicating a directive. The recruit had admittedly failed to convey a prior directive from Chief Parsons. The recruit entered the body bag willingly, stated that he stayed there about one minute and was not injured or harmed, and specified in his oral investigative statement that the technique was very effective at demonstrating to the recruits the importance of both properly communicating orders and doing their training correctly and the consequences of not doing so. None of the other recruits in attendance complained about the body-bag illustration and the recruits provided favorable statements regarding the lesson during the investigation. The recruits reported that no one's health was in

8

danger, that no one was observed to be in physical distress, and most reported that the chosen recruit remained in the body bag between one and several minutes, a period significantly shorter than the fifteen-minute period reported by Battalion Chief Rios and stated in Chief Marron's incident report.

On August 2, 2007, Chief Parsons submitted a grievance through Chief Marron to Fire Chief Rivera wherein he complained of being permanently reassigned from the training academy to the Logistics Section at headquarters without reason or explanation.[3] Fire Chief Rivera denied Chief Parsons' grievance but permitted him to file an addendum, which Fire Chief Rivera denied the day after it was filed. Nor did Fire Chief Rivera inform Chief Parsons of a reason for his transfer out of the training academy after he filed his grievance challenging the involuntary transfer.

In its September 25, 2007, "Disposition" of the body-bag investigation, the Fire Department lists several provisions of its Fire Department Rules and Regulations Manual relating to obedience to rules, general conduct, and "safety policy," recites a summary of its findings, and states that Chief Parsons was originally given a two-day suspension for "Unprofessional Conduct." The fire department's disposition does not, however, specify how Chief Parsons' conduct violated the broadly-worded rules enumerated therein, but in a note signed on October 23, 2007, at the conclusion of the disposition, Fire Chief Rivera on October 23, 2007, states that the "[t]rainees do not have to learn how it feels to be zipped up within" a body bag. Fire Chief Rivera's note also states that other positive motivational tools may be implemented before resorting to negative, safety-questionable approaches. Nonetheless, Chief Parsons was not permitted to return to his duties at the training academy. Fire Chief Rivera testified that the imposition of a two-day suspension was appealable to a hearing officer.

---

[3] Four other training academy personnel were also transferred from the academy.

9

Approximately five weeks later, on November 30, 2007, Fire Chief Rivera signed and issued a written reprimand regarding the body-bag investigation, which was not provided to Chief Parsons until January 7, 2008. The written reprimand adopted Fire Chief Rivera's comments from the previous disposition. However, unlike the previous disposition, the written reprimand did not recite any of the favorable facts provided by the recruits and fire personnel during the investigation, relied heavily upon the initial report prepared by Chief Rios, and included a new finding that Chief Parsons' conduct was both unprofessional and unacceptable. Fire Chief Rivera admitted that there was no explanation for changing the disposition of the investigation from the two-day suspension, which Chief Parsons could have appealed, to the written reprimand, which Chief Parsons could not appeal.

During trial, Fire Chief Rivera agreed that there was no rule or regulation prohibiting Chief Parsons from using a body bag or the training technique which Chief Parsons had used, that he had never personally directed Chief Parsons to refrain from using the bag again, and that he had never provided Chief Parsons the opportunity to follow such a directive. Fire Chief Rivera acknowledged that the recruit who placed himself inside the body bag stated that, "It was a good lesson," and that from the activity, the recruit had learned the importance of acknowledging and transferring orders, a lesson that is important in a paramilitary organization like the fire department.

The fire department's evaluation of Chief Parsons for the period of December 1999 to December 2000, had concluded that his overall performance was "exceptional" and was provided to him in February 2001. Chief Parsons' next evaluation for April 2005 to April 2006 was signed by Fire Chief Rivera and presented to Chief Parsons more than one year and four months later, on September 18, 2007, approximately seven weeks after his transfer from the training academy and

the commencement of the investigation, and noted that Chief Parsons' conduct was merely "competent." This evaluation contained no comments regarding the training academy going in a wrong direction or needing to go in a new direction, nor any negative comment about Chief Parsons' operation of the training academy. After Chief Parsons' commenced this suit, the fire department's next evaluation of his performance as Training Chief from April 2007 to April 2008 rated Chief Parsons' overall performance as "exceeds performance standards." However, this report did not reflect Chief Parsons' alleged misconduct in March and April 2007, the resulting reprimand, the facts that a lower-ranking officer, Battalion Chief Carmona was operating the training academy and that Chief Parsons had been transferred away from the training academy, nor did it indicate that the training academy needed to move in a new direction, that the academy had "moved in a different direction," or otherwise express any dissatisfaction in the manner in which Chief Parsons had directed operations at the training academy before his transfer.

During the following two years following his transfer to the Logistics Section at fire department headquarters, Chief Parsons spent one day working with a fire department employee on civil service examination material, spent a few months developing standard operating procedures, and was most often relegated to running errands, picking up parts, pulling weeds, and picking up trash.

Chief Parsons noted that in his twenty-seven years as a fire-department employee, he had never known any other Training Chief to work at headquarters. Fire Chief Rivera also acknowledged that in his thirty-seven year employment at the fire department, he had never seen a Training Chief work outside of the training academy, that he had assigned and removed staff from the training academy without consulting Chief Parsons, that he never informed Chief Parsons that Chief Parsons

11

was taking the training academy in the wrong direction or that Chief Parsons needed to move the academy in a new direction, and admitted that he had signed a memorandum prepared by Chief Marron indicating that the training academy needed new personnel before ever discussing with Chief Parsons the merits of the accusations against him. Fire Chief Rivera admitted that "someone" should have given Chief Parsons a reason for his removal from the training academy at the time he was removed, acknowledged that the fire department's administrative procedures require that an officer seeking to transfer a member must do so in writing to the Chief and state the reasons therefor, denied that he was required to document Chief Parsons' transfer, and agreed that no such documentation exists. Fire Chief Rivera testified that transfers are not punishment but stated that he understood that under the Texas Whistleblower Act, transferring a person who reports a violation can constitute retaliation.

After Fire Chief Rivera retired from the fire department in December 2008, Fire Chief Rivera's replacement, Fire Chief Drozd, transferred Chief Parsons back to the training academy and stated that he was doing so because it was the right thing to do.

At the conclusion of trial, the jury concluded that the City of El Paso had retaliated against Chief Parsons for reporting the fire department's and Fire Chief Rivera's violations to the TCFP. The jury awarded Chief Parsons $100,000 past compensatory damages, and the trial court awarded attorneys' fees.

## DISCUSSION

### I. Sufficiency of the Evidence

In Issue One, Appellant challenges the legal and factual sufficiency of the evidence to show a causal link between Chief Parsons' report to the TCFP and his transfer, and in Issue Two,

12

Appellant similarly challenges the sufficiency of the evidence to demonstrate an adverse personnel action.

*Standard of Review*

When considering the legal sufficiency of the evidence to support a finding, we must credit evidence favorable to the judgment if a reasonable fact finder could, disregard contrary evidence unless a reasonable fact finder could not, and reverse the fact finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded fact finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We sustain legal-sufficiency challenges if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When reviewing a challenge to the factual sufficiency of the evidence, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either standard, we are mindful that the jury as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlman*, 722 S.W.2d 694, 696 (Tex. 1986). The jury may choose to believe one witness and disbelieve another, and we must not impose our own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819.

13

A. Causal Link

In Issue One, the City contends that there is "a complete absence" of evidence of a vital and necessary fact to justify Chief Parsons' recovery and argues that the jury's verdict is contrary to the overwhelming weight of evidence. We disagree.

A state or local governmental entity is liable for damages under the Texas Whistleblower Act if it suspends, terminates, or takes adverse personnel action against a public employee who in good faith reports to an appropriate law enforcement authority either the entity's or another employee's violation of law. TEX. GOV'T CODE ANN. §§ 554.001-010 (West 2004). To show causation in a whistleblower case, an employee "must demonstrate that after he or she reported a violation of the law in good faith to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his or her employer that would not have occurred when it did if the employee had not reported the illegal conduct." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000), *citing Dept. of Human Service v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995). The Texas Whistleblower Act does not require that the public employee prove that his report of illegal conduct was the sole reason for the employer's adverse personnel action. *Hinds*, 904 S.W.2d at 634. The Texas Supreme Court has suggested that the Act does not permit an employee's report of illegal conduct to play any role, however small, in deciding whether to sanction the employee. *Hinds*, 904 S.W.2d at 635. When some evidence exists to support a finding that an adverse employment decision would not have been taken if the employee did not report the violation, a jury may infer causation. *See Zimlich*, 29 S.W.3d at 68, *citing Hinds*, 904 S.W.2d at 633. A jury cannot infer causation without some evidence to support the finding. *Id.*

A causal link between the adverse employment action and the employee's report of the illegal

14

conduct may be established by circumstantial evidence, including: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly-situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Zimlich*, 29 S.W.3d at 69.

Appellant complains that there is no evidence of a vital and necessary fact that would justify Chief Parsons' recovery under the Texas Whistleblower Act and argues that none of the factors necessary to find circumstantial evidence of causation exists. *Zimlich*, 29 S.W.3d at 69. We disagree and believe there is sufficient evidence in the record to establish one, and perhaps more, of the factors for finding causation by means of circumstantial evidence.

Fire Chief Rivera testified that he did not know of Chief Parsons' report to the TCFP and the jury chose to disbelieve him. Although there is no direct evidence of Fire Chief Rivera's knowledge of Chief Parsons' report prior to the filing of this lawsuit, upon reviewing the entirety of the record, we find there is some evidence, albeit circumstantial, to permit a jury to infer in this specific case that Fire Chief Rivera knew that Chief Parsons was the source of the TCFP's finding that Fire Chief Rivera had falsified the renewal certificate, as Chief Parsons had informed Assistant City Attorney Rodriguez that he had in fact reported the fire department's and Fire Chief Rivera's violations to the TCFP, and Chief Parsons had notified other Chiefs within the fire department that the only way to resolve the fire department's continuing failure to comply with continuing education requirements was to make the report to the TCFP. Not only the adverse personnel action but the timing of the adverse personnel action in relation to the reported violation support the jury's conclusion.

More significantly, there was not only some evidence but abundant evidence that the stated

reason for transferring Chief Parsons from the Training Academy, that is, because the Training Academy was moving in a "different direction," was pretextual and false. Rivera's performance evaluations never indicated that Chief Parsons' operation of the Training Academy was wrong, poor, or otherwise deficient, or that Chief Parsons was not capable of taking the training academy in a different direction. The jury had before it evidence that Battalion Chief Rios' complaints regarding the March and April 2007 training events were not filed until: (1) after Chief Parsons reported the non-compliance and certificate of renewal violations in April 2007; (2) after the TCFP had notified the Fire Department of the violations in May 2007; (3) after Assistant City Attorney Rodriguez and Chief Parsons had discussed his report to the TCFP in June 2007; and (4) after the Fire Chief and the Assistant City Attorney traveled together to address the TCFP in Austin in July. The evidence also consisted of: (1) the transfer of Chief Parsons from the training academy while retaining his title and an increase in salary; (2) the assignment of a different Chief to operate the Training Academy and the prohibition against Chief Parsons having any contact with recruits, despite holding the title of Training Chief; (3) the favorable written statements and transcribed interviews of relevant personnel elicited during the body-bag training investigation, which contradicted Battalion Chief Rios' initial incident reports, and which indicated that Chief Parsons' lesson regarding the importance of following and conveying orders was good; (4) the positive letters from school personnel and a parent, and the positive statements and interviews of fire-department personnel regarding the participation of students at the Training Academy's "shadow" days, including the favorable statement of the school district representative whose ill student was the catalyst of Battalion Chief Rios' complaint; (5) both Fire Chief Rivera's testimony and the personnel documents which showed his decision to change Chief Parsons' two-day suspension, which was

16

appealable, to a written reprimand, which was not appealable; (6) Chief Parsons' evaluations; and (7) the return of Chief Parsons to the training academy by Fire Chief Drozd after Fire Chief Rivera's retirement.

Consequently, because there is some evidence that the stated reason for the adverse employment action was false, and that Chief Parsons would not have been transferred away from the training academy or suffered a loss of duties if he had not reported the violations to the TCFP, the jury was permitted to infer causation. *Zimlich*, 29 S.W.3d at 67; *Hinds*, 904 S.W.2d at 633. There being more than a scintilla of evidence to support the jury's finding that Chief Parsons' report to the TCFP was made in good faith and was a cause of the City's reassignment of him, and because the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, the evidence is both legally and factually sufficient to support a finding of causation. *Zimlich*, 29 S.W.3d at 67; *Hinds*, 904 S.W.2d at 633. Issue One is overruled.

B. Adverse Employment Action

In Issue Two, the City argues that the evidence was legally and factually insufficient to support a finding that Chief Parsons suffered an adverse employment action under the Texas Whistleblower Act. TEX. GOV'T CODE ANN. §554.002(a) (West 2004). We disagree.

The Act defines a "personnel action" to be one that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation. TEX. GOV'T CODE ANN. § 554.001(3) (West 2004); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.3d 345 (2006) (recognizing that retaliatory work assignments have been consistently found to be classic and widely recognized examples of "forbidden" retaliation). A personnel action is adverse under the Texas Whistleblower Act if it would be likely

17

to dissuade a reasonable, similarly-situated worker from making any report covered by the Act. *Montgomery County v. Park*, 246 S.W.3d 610, 612, 614-15 (Tex. 2007) (adopting with modifications the standard established in *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68, for analysis in case involving the Texas Whistleblower Act).

The trial court's charge to the jury asked, "Was Alan Parsons' report to the Texas Commission on Fire Protection made in good faith and a cause of the City of El Paso's reassigning Alan Parsons?" Invoking Rule 279 of the Texas Rules of Civil Procedure, the City contends that Chief Parsons' reassignment is the only action relevant to a determination of whether the City is liable under the Texas Whistleblower Act and asserts that no other complained-of actions occurring during his employment form the basis of the jury's verdict. TEX. R. CIV. P. 279. The City argues that Chief Parsons transfer to a less prestigious position did not constitute an adverse employment action because there was no reduction in his pay or pay grade and he received a $2,000 pay raise thirteen days after he was transferred from the training academy and a total increase in pay of more than $8,000 afterward. The City also contends that Chief Parsons was given the opportunity to perform the same duties within his job description after he was transferred from the training academy and was to continue doing what a Training Chief "normally" did. However, Chief Parsons presented testimony under cross-examination that there were many tasks that he "could" have performed and would have performed but he was instructed not to do so. Chief Parsons agreed that transfers within the fire department occurred regularly and fairly routine.

"An act that would be immaterial in some situations is material in others." *Montgomery County*, 246 S.W.3d at 615, *quoting Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69. We must consider the effects of a challenged personnel action as a whole and in light of all the circumstances,

18

and the presence or absence of any factor such as, but not limited to, loss or retention of seniority, position, authority, pay, prestige, or choice of additional work opportunities, is not dispositive. *See Montgomery County*, 246 S.W.3d at 616 (removal of first choice of jobs at a convention center from a Sheriff's Department lieutenant was not likely to deter a similarly-situated, reasonable employee from reporting a violation of law and was not materially adverse).

We need not recite again the evidence presented at trial which we have considered in analyzing the City's sufficiency challenges. We take as true all evidence favorable to Chief Parsons, indulge every reasonable inference, and resolve any doubts in his favor. *Id.* at 614-15. Applying the objective standard applicable to cases brought under the Texas Whistleblower Act, we conclude that under the specific facts of this case, Chief Parsons' reassignment would, as a matter of law, be likely to deter a similarly-situated, reasonable employee from reporting a violation of the law and, thus, was materially adverse. *Id.* There is more than a scintilla of evidence to support the jury's finding of adverse personnel action, and the finding is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. Consequently, the evidence is both legally and factually sufficient to show that an adverse action occurred. Issue Two is overruled.

*II. Attorneys' Fees*

In its third issue, the City complains that because Chief Parsons failed to designate his expert witness on attorneys' fees prior to the return of the jury's verdict, the trial court erred in permitting Chief Parsons' to recover attorneys' fees.

Attorneys' fees are not recoverable from an opposing party unless a statute or contract between the parties permits such recovery. *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996). The Texas Whistleblower Act permits a successful aggrieved employee to recover

19

reasonable attorneys' fees. Tex. Gov't Code Ann. § 554.003(a)(4) (West 2004).

Rule 195.2 requires a party that seeks affirmative relief to designate testifying experts by the later of thirty days after a request for disclosure is served or 90 days before the end of the discovery period. Tex. R. Civ. P. 195.2. A party supplementing discovery must serve the supplemental response "reasonably promptly" after the need arises. Tex. R. Civ. P. 193.5(b). A supplemental response given less than thirty days prior to trial is presumed to have not been made in a reasonable and prompt manner. *Id.* A party's failure to designate its expert witness in a timely manner results in exclusion of the expert's testimony unless the party seeking to call the expert can show good cause for failing to timely respond or that the failure to timely respond will not unfairly surprise or unfairly prejudice the other parties. Tex. R. Civ. P.193.6(a)(2). A determination of good cause rests within the sound discretion of the trial court. *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 298 (Tex. 1986). Rule 193.6(c) also provides the trial court with the discretion to grant a continuance to allow a response to be made, amended, or supplemented, and to allow the parties to conduct discovery regarding any new information presented by the response. Tex. R. Civ. P. 193.6(c).

In his original petition filed two years before trial, Chief Parsons sought to recover reasonable and necessary attorneys' fees. The trial court did not adopt a discovery plan but ordered that all discovery be completed by the date of the final pretrial hearing, October 23, 2009. Within the discovery period, Chief Parsons responded to the City's request for disclosure by noting that he had not designated any testifying experts at the time but would supplement the response if such expert was retained. The City filed a motion in limine requesting that the trial court direct Chief Parsons be refrained from calling any expert to testify unless the expert, the expert's qualifications, the substance of the facts and opinions about which the expert may testify, and a summary of the facts

20

available to the expert were timely identified and provided pursuant to Rules 194.2(f) and 195. TEX. R. CIV. P. 194.2(f), 195. The City's motion also requested that Chief Parsons "refrain from attempting to elicit testimony from any witness on the subject of Plaintiff's attorney's fees, as attorney's fees are recoverable only as an element of costs in an action brought under the Texas Whistleblower Act, not the jury." No pre-verdict designation of testifying witnesses exists in the appellate record.

After the jury's verdict was received on November 25, 2009, Chief Parsons filed an application for attorneys' fees and costs to which was affixed his counsel's "expert" affidavit. At the December 18, 2009, hearing on Chief Parsons' application, the City said it was unfairly surprised that Chief Parsons was going to seek attorneys' fees. The trial court allowed Chief Parsons' counsel until the end of the day to designate himself as an expert, instructed the City to designate its expert by December 28, 2009, and continued the hearing until February 1, 2010. The trial court awarded trial and appellate attorneys' fees to Chief Parsons and entered its judgment four days thereafter.

As requested by the City, the trial court issued findings of fact and conclusions of law. There, the trial court found that the City's "claim of unfair surprise and undue prejudice rings hollow in light of the fact that Plaintiff's Original Petition (served two years before trial) indicates that 'reasonable and necessary attorneys' fees' were being sought as part of the relief requested." The trial court noted that in its pretrial motion in limine, the City sought to exclude any testimony regarding Appellee's attorneys' fees during trial. To cure any alleged "surprise," the trial court explained that it had provided the parties six additional weeks to conduct additional discovery before the hearing on Chief Parsons' application for attorneys' fees, and noted that Chief Parsons' counsel, Mr. Francisco X. Dominguez, and the City's counsel, Mr. Mitch Moss, each had designated himself

21

as an expert witness on the issue of reasonable and necessary attorneys' fees. For these reasons, the trial court had admitted and considered the affidavit of Chief Parsons' attorney, Mr. Dominguez, into evidence at the February 1, 2010 hearing.

Mr. Dominguez had represented Chief Parsons since the inception of the underlying suit in which Chief Parsons stated two years prior to trial that he would be seeking the recovery of attorneys' fees under the Texas Whistleblower Act. Although Mr. Dominguez did not identify himself as a "testifying expert" in response to the City's pretrial Request for Designation, the City had filed a pretrial motion in limine restricting Chief Parsons' presentation of any attorneys' fees testimony during trial, a fact, the impact of which the City has failed to address in its challenge to the trial court's award of attorneys' fees. Chief Parsons designated Mr. Dominguez as his expert on attorneys' fees when he filed his application for attorneys' fees and costs. In response to the City's objections, the trial court provided the City six additional weeks to consider Chief Parsons' application and the specified sums sought for trial, post-verdict, and appellate attorneys' fees as well as costs.

Under these facts, we find that the trial court acted within its discretion under Rule 193.6 when it implicitly found good cause and no unfair surprise to the City and awarded attorneys' fees to Chief Parsons. TEX. R. CIV. P. 193.6; *see Beard Family Partnership v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 850 (Tex. App. – Austin 2003, no pet.) (where party who complained that untimely designation of expert witness on attorney's fees should have been excluded also sought exclusion of attorney-fee testimony through a motion in limine at trial, where the offering party's pleadings contained a request for attorney's fees from the inception of the suit, and where the trial court permitted argument, briefing, and a postponement of testimony to allow complaining party to

depose offering party's attorney-fee expert, the trial court did not abuse its discretion in finding there was good cause to allow the attorney's fees expert to testify). Issue Three is overruled.

**CONCLUSION**

The trial court's judgment is affirmed.


                                              GUADALUPE RIVERA, Justice

October 5, 2011

Before Chew, C.J., McClure, and Rivera, JJ.