Court of Appeals
Fourth Court of Appeals District of Texas



# MEMORANDUM OPINION

No. 04-11-00402-CV

**CITY OF SAN ANTONIO**, and its Agent, San Antonio Water System,
Appellant

v.

Albert Kevin **MARTIN** a/k/a Kevin Martin,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CI-18763
Honorable Richard Price, Judge Presiding

Opinion by:     Karen Angelini, Justice

Sitting:        Karen Angelini, Justice
                Sandee Bryan Marion, Justice
                Marialyn Barnard, Justice

Delivered and Filed:  August 29, 2012

AFFIRMED AS MODIFIED

This appeal arises from a whistleblower action filed by Albert Kevin Martin against his former employer, San Antonio Water System and the City of San Antonio (collectively "SAWS"). After a jury found in favor of Martin and awarded him damages, SAWS appealed to this court, arguing that (1) the evidence is legally and factually insufficient to prove causation; and (2) the evidence is legally and factually insufficient to support the jury's award of compensatory damages. We find the evidence legally and factually sufficient to prove causation,

but because we hold there is no evidence to support the jury's award of compensatory damages, we modify the judgment to delete all references to compensatory damages. As modified, we affirm the judgment.

BACKGROUND

In December 2001, Martin was hired by SAWS to work in its Distributions and Collections Operations in its Northwest Service Center, and after working at SAWS for only six months, he was promoted to equipment operator. Martin received excellent work evaluations, which were admitted into evidence at trial. An evaluation dated May 9, 2002, reflected that Martin made "sound and informed decisions"; was "very considerate of others within and outside the organization"; demonstrated "superior skills when performing his job"; made "few errors and [wa]s very thorough"; and "listen[ed] attentively." His direct supervisor stated in Martin's evaluation that "Mr. Martin is a very good employee to work with." In an evaluation dated March 18, 2005, Martin's supervisor stated that Martin's performance "achieved expectations in some categories, and in other categories, he substantially exceed[ed] expectations." In his evaluation dated March 9, 2007, Martin's supervisor, noting that Martin had "good work ethics," stated that Martin "needs to think about getting a higher position."

At trial, Martin testified that in late 2006, he became concerned with how SAWS was handling and disposing of pipe that contained asbestos at the Medio Creek site. He believed SAWS's practice of crushing the pipes created dust with asbestos particles that was dangerous to workers and the community. He was also concerned with the manner in which SAWS was disposing of the pipes at a dump site, which was operating like a landfill. He brought his concerns to his supervisor, Arnulfo Mesa, but was told that the way in which the SAWS employees were handling and disposing of the pipes containing asbestos was not dangerous. He

then took his concerns to Tracy Marlowe, who relayed Martin's concerns to Will Pickford, a SAWS safety specialist. Martin gave Pickford pictures of asbestos pipe lying in clear view near Bandera Road. Pickford told Martin that "things move painfully slow around here," but that Martin should not "give up hope" and that "hopefully, it will get looked at." When Martin saw nothing happening within SAWS, in January 2007, he made a complaint to the Texas Commission on Environmental Quality ("TCEQ"). In April 2007, Henry Karnei, who was with the TCEQ, called Martin and said that SAWS "wanted to get together" with the complainant and "try to bring this issue to an end." Karnei asked Martin if he would be willing to give up his anonymity and meet with SAWS officials. Martin replied that he was concerned SAWS would retaliate against him for reporting the illegal dump site. In response, Karnei said he would call Steve Clouse, vice president of SAWS's Production and Treatment Operations. According to Martin's testimony, Clouse responded that the complainant would be protected under the Whistleblower Act. Thus, Martin gave up his anonymity and on July 30, 2007, Martin met with TCEQ and SAWS officials, including Clouse; Raymond Perez, a SAWS manager; David Bascom, a SAWS safety official; and Alan Jones, an investigator with TCEQ. Thus, as of July 30, 2007, upper management of SAWS was aware that Martin was the person who had filed the complaint with TCEQ. Martin testified that when he expressed his concerns at the July 30, 2007 meeting, he was told by Clouse that "we've always done it this way." Later, in October 2007, Martin made a second complaint to TCEQ about a SAWS storage yard on O'Connor Road, stating that asbestos-containing concrete pipe was in a creek bed on the site. Martin continued to be in contact with TCEQ regarding SAWS's remediation efforts. Martin testified that after he gave up his anonymity, he was treated differently at work, and the foremen and his co-workers stopped talking and interacting with him. After Martin complained to TCEQ, SAWS instituted

new procedures for handling and disposing of asbestos pipe. According to Martin, there were a lot of complaints among the foremen and workers about the new procedures, and comments were made that Martin was the cause of these new procedures. On February 15, 2008, Martin was placed on administrative leave, and on August 5, 2008, Martin was given a Notice of Proposed Termination. The reasons given by SAWS for his administrative leave and for his proposed termination were unrelated to his TCEQ complaint. Instead of being terminated, Martin retired. He later sued SAWS for constructive discharge in violation of the Whistleblower Act.

At trial, Alan Jones, an investigator with TCEQ, testified that he was assigned to investigate the complaint made by Martin. According to Jones, he went to the Medio Creek site unannounced and met with people who took him to the disposal or fill area. Jones found what looked to be asbestos-containing concrete pipe in three locations on the site. Thus, Jones testified he was able to substantiate Martin's complaint. A notice of violation was issued, and on May 4, 2007, Clouse, SAWS's vice-president of Production and Treatment Operations, wrote a letter in response:

> SAWS does not believe a notice of violation is appropriate in this case, as there is no storing or disposing of asbestos-cement (AC) pipe or municipal solid waste at the Medio Creek Water Recycling Center. We appreciate the opportunity to provide you with additional information regarding our efforts and to continue our positive work with the Region 13 office. As we mentioned in our February 9, 2007, letter, the site is used as a location to deposit only appropriate clean fill material from SAWS utility work. Prior to the site visit by Mr. Jones of the TCEQ staff on February 2, 2007, SAWS had instituted the following materials handling improvements to be used in our operations and at the Medio Creek Water Recycling Center:
>
> - Review and update of AC pipe handling policies and procedures
> - Use of an approved contractor to ensure proper transportation and disposal of AC pipe
> - Mandatory training of foremen and crews on proper handling and disposal of AC pipe
> - Separation of waste materials from clean fill prior to transportation to the Medio Creek facility

- Training of maintenance employees and foremen on proper fill material allowed at the site
- Routine monitoring of deposited clean fill material at the Medio Creek site
    - Weekly inspections by the facility manager

During the visit by Mr. Jones, a member of TCEQ staff, three small fragments of alleged AC pipe were observed and collected. Since the visit, SAWS has instituted the following additional procedures:

- Enhanced monitoring of deposited clean fill material at the Medio Creek site
    - 2-3 inspections/week by the facility manager
    - 2 inspections/week by the Service Center General Foreman
    - 2 inspections/month by a SAWS environmental analyst
- Relocation of a dumpster and a separate roll-off box at the Medio Creek fill site for any unacceptable fill material observed during leveling of clean fill or inspections

SAWS has a robust program to manage waste generated in our system repair work and to monitor the Medio Creek site. In direct response to the notice of violation, we organized a crew of employees to again walk the site (pictures enclosed) looking for possible evidence of waste materials – specifically small fragments of AC pipe. Any materials that may be observed at Medio Creek will be properly handled and disposed of through our approved contractor. . . . Simply stated, SAWS is not using the Medio Creek site to dispose of asbestos pipe or municipal solid waste.

Jones testified that he was unhappy with this response and found these statements to be inaccurate and untruthful. Because the asbestos pipe was exposed, Jones believed there was a health risk to residences and a nearby school. In December 2007, Jones met with his boss, Henry Karnei, and Val Ruiz, vice president of SAWS's Distributions and Collections Operations. According to Jones, they discussed that TCEQ was going to require remediation of the site. When asked whether Martin was discussed at the meeting, Jones testified, "My understanding was that Mr. Martin was being insistent that the matter be addressed. To me, this is something that once it was in our system, then we had a notice of violation [and] it would get addressed." When asked to clarify whether Martin forcing the issue was specifically discussed, Jones testified that all he could remember was that "Kevin Martin and the allegations were discussed."

When Martin made the second complaint regarding the O'Connor road site, Jones inspected it and again found pieces that looked to be asbestos-containing concrete pipe on the surface.

According to Jones, there was mutual frustration on his and Martin's part that it was taking so long to remediate the site. Jones testified that TCEQ has a policy that investigation at the region level be concluded within six months or be referred to the remediation division in Austin. Jones stated that "[t]his attempt to resolve the problem . . . exceeded those time frames." The case was transferred to Austin, and although Jones made recommendations, his recommendations were not followed. Instead, Jones testified, the ultimate remediation plan approved by TCEQ with regard to the Medio Creek site did not require the waste to be removed. The plan provided for a capping and deed restriction process, which only required the pieces of pipe to be covered with soil and a deed restriction to be put in place.

Jones's boss, Henry Karnei, Jr., the TCEQ waste program manager in charge of the SAWS investigation, also testified at trial. Karnei testified that with respect to Martin's complaint, two violations were issued against SAWS: one for the Medio Creek site and the other for the O'Connor Road site. After the Medio Creek violation was issued against SAWS, Karnei testified that based on Jones's investigation of the Medio Creek site, TCEQ disagreed with SAWS's position that no violation had occurred. Karnei testified that when SAWS proposed a remediation plan, TCEQ rejected it because SAWS was not assessing the entire area, but was instead looking at only the front third of the site and not the entire three or four acres. According to Karnei, TCEQ required the entire area to be assessed, which increased the cost of remediation. Karnei testified that although Martin's complaint was filed in early 2007, it was not until May of 2010 that SAWS finally created a remediation plan approved by TCEQ.

SAWS argued at trial that Martin was not constructively discharged as a result of his complaint to TCEQ but because of an unrelated email controversy involving pornographic emails exchanged between SAWS employees. Martin was not involved in this email investigation, as he did not have a SAWS computer, email, or ability to access SAWS's computer system. Martin's friend, Mark Garcia, was involved and had received a Notice of Proposed Termination in January 2008, which required him to make a response in three days. When Garcia went to SAWS to deliver his response to SAWS's Human Resources representative, Michele McGervey, Martin testified that he accompanied Garcia for moral support. According to Martin and Garcia's testimony, because Garcia was unable to get past security to deliver his response, Martin took Garcia's written response past security, gave it to a SAWS receptionist, and told the receptionist that Garcia was waiting in the lobby. Both Garcia and Martin testified that McGervey came down to the lobby and spoke with Garcia. Martin did not speak with McGervey. During her testimony at trial, McGervey claimed that Martin must have created a disturbance for her to be called down to the lobby, although she had no recollection of the event.

On February 11, 2008, an "all-hands meeting" was called at the Northwest Service Center where Martin worked to discuss the email investigation. Val Ruiz spoke to the employees about the investigation. Martin asked Ruiz a question during this meeting. Some witnesses testified that Martin waited until Ruiz asked the employees whether they had any questions, at which point Martin raised his hand. Ruiz testified that Martin interrupted his presentation. Martin then asked why SAWS was targeting the "little people" in its investigation and not two general foremen. Some witnesses testified that Martin called the two foremen, James Stautzenberger and Arnulfo Mesa, by name. Others testified that Martin pointed in the direction of Stautzenberger

and Mesa. Martin specifically testified that he raised his hand and asked Ruiz, "Why are they going after the little guys? How come they're not going after management?" Martin testified that Ruiz told him in response, "You have no proof that anyone's name is on e-mails." Martin, who had been given copies of certain emails, testified that he said in response, "Yes, I do. I have proof that two general foremen's names, Arnulfo Mesa and James Stautzenberger's names are on e-mails." According to Martin, Ruiz then said, "Gather your information and give them to me." Martin testified that he then said, "Well, let's have a meeting with Dave Chardavoyne, the president of SAWS, and the vice president, Jerry Bailey, and let's sit down, and we'll go over those e-mails." According to Martin, Ruiz then said he would set up the meeting. Ruiz also testified that he told Martin to gather his information and that he would set up a meeting, but Ruiz disputes the manner in which Martin asked his question. Both Ruiz and Michele McGervey, SAWS's Human Resources representative, testified that Martin was rude and inappropriate. Other witnesses, however, who were also present at the "all-hands meeting," testified that Martin did not act inappropriately and that they did not think anything about his conduct.

Martin testified that in response to Ruiz's request and on his personal time, he began accumulating hard copies of the emails from current and former employees off site so that he could present the emails at the meeting Ruiz had promised to set up. And, on February 15, 2008, Martin had the emails in his lunch bag on the work site in case he received a call from Ruiz about the meeting. On that day, he was assigned to a foreman with whom he did not usually work, Gilbert Zuniga. Zuniga was late to the work site because he had been interviewing at SAWS for a general foreman's position. When Zuniga arrived at the work site, one of the other workers asked Zuniga how his interview went. According to Martin, Zuniga replied, "These guys ain't ready for me because if I make general foreman, I'm going to fire a lot of them." Martin

testified that Zuniga then mentioned he would "try to get rid of Arnulfo Mesa, because he was lazy and didn't do his job as general foreman." Zuniga then turned and asked Martin, "Hey, do you really have that information that Val Ruiz asked you about? By the way, I think you're right about the little guys getting terminated, because I have some emails with people's names on them." According to Martin, Zuniga specifically said that he had an email with James Stautzenberger's name on it. Martin testified that Zuniga then said, "Let me see your proof that you have for Val Ruiz." So, they walked to the vehicle and Martin got his lunch bag with the emails inside. He gave hard copies of the emails to Zuniga who began looking at them. Other members of the crew approached and saw the emails as Zuniga was holding them. According to Martin, Zuniga and the other crew members laughed when they saw the pictures in the emails. Martin testified that he showed Zuniga the emails because Zuniga was his superior and because Zuniga made him "feel comfortable that he was going to do something about it." Zuniga handed the emails back to Martin, and Martin put the emails back into his lunch bag.

Zuniga testified that he never asked to see the emails and that Martin volunteered them on his own. Zuniga stated that he found the pictures in the emails to be offensive and told Martin to put them away. Zuniga then called the Northwest Service Center and told Martin that "they" wanted to see him in the office. Zuniga drove Martin back to the Northwest Service Center for a meeting with Gordon Mahan, the director of the Northwest Service Center; Michele McGervey, the H.R. representative; and Josh Dean, a security officer. Martin was told that he was being placed on paid administrative leave for showing the emails to Zuniga at the work site. Martin responded that Zuniga had directed him to do so. On February 20, 2008, Martin again met with McGervey, Ruiz, and Dean, at which time he gave them copies of the emails. On February 22, 2008, Martin's lawyer responded to Martin's being placed on administrative leave, asserting that

SAWS appeared to be retaliating against Martin for reporting its conduct to TCEQ and that the stated email reason was a pretext. On August 5, 2008, Martin met with Mahan and McGervey. He was given a Notice of Proposed Termination, which listed the following grounds:

- Willful violation of any company policy or procedure; any deliberate action that is extreme in nature and is obviously detrimental to SAWS's efforts to operate effectively.
- Immoral conduct or indecency on company property or while on duty.
- Disorderly/obscene or abusive language toward any employee or customer; indifference or rudeness toward a customer or fellow employee; any disorderly/antagonistic conduct on company premises.
- Any act of harassment, sexual, racial or other.
- Insubordination or refusing to obey instructions properly issued by a superior in your direct chain of command pertaining to your work.

After hearing all the evidence, the jury found that SAWS had constructively discharged Martin because Martin had in good faith reported one or more suspected violations of law to TCEQ. When asked whether SAWS would have constructively discharged Martin "based solely on information, observation, or evidence that is not related to the fact that Martin made the report to TCEQ," the jury answered, "No." The jury then awarded Martin $40,970.00 in lost wages sustained in the past; $39,468.00 in lost wages that in reasonable probability will be sustained in the future; $22,303.76 in lost employment benefits (other than loss of earning) sustained in the past; and $7,602.92 in lost employment benefits (other than loss of earnings) that will in reasonable probability be sustained in the future. The jury was also asked to award compensatory damages, which it was instructed included "emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-economic losses." The jury awarded $110,334.68 in compensatory damages sustained in the past and $55,172.34 in compensatory damages that will in reasonable probability be sustained in the future.

On appeal, SAWS argues that the evidence is legally and factually insufficient to support a causal link between Martin's report to TCEQ and his constructive discharge. SAWS also

argues that the evidence is legally and factually insufficient to support the jury's award of compensatory damages.

### STANDARD OF REVIEW

When reviewing a jury finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable fact-finder could not, and reverse the fact-finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded fact-finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain legal-sufficiency challenges only if the record reveals (1) that there is no evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When reviewing a jury finding for factual sufficiency, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either standard of review, we are mindful that the jury as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The jury may choose to believe one witness and disbelieve another, and we must not impose our own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819.

## CAUSATION

Pursuant to the Texas Whistleblower Act, a state or local governmental entity is liable for damages if it suspends, terminates, or takes adverse personnel action against a public employee who in good faith reports to an appropriate law enforcement authority either the entity's or another employee's violation of law. *See* TEX. GOV'T CODE ANN. §§ 554.001-.010 (West 2012). To show causation in a whistleblower case, an employee "must demonstrate that after he or she reported a violation of the law in good faith to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his or her employer that would not have occurred when it did if the employee had not reported the illegal conduct." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000) (citing *Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995)). The Texas Whistleblower Act does not require that the public employee prove that his report of illegal conduct was the sole reason for the employer's adverse personnel action. *Hinds*, 904 S.W.2d at 634. "When some evidence exists to support a finding that an adverse employment decision would not have been taken if the employee did not report the violation, a jury may infer causation." *City of El Paso v. Parsons*, 353 S.W.3d 215, 225-26 (Tex. App.—El Paso 2011, no pet.) (citing *Zimlich*, 29 S.W.3d at 68).

A causal link between the adverse employment action and the employee's report of the illegal conduct may be established by circumstantial evidence, including: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly-situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Zimlich*, 29 S.W.3d at 69.

Here, Martin was given good evaluations until it became known that he was the one who had made the complaint regarding the asbestos pipes. SAWS argues that "most" of the decision-makers involved in Martin's termination did not know Martin had made the complaint to TCEQ. SAWS states that it is apparent from the record that the decision-makers in this case were McGervey, the H.R. representative; Ruiz, the relevant vice president; Jerald Bailey, vice president of Human Resources; Mahan, the director of the Northwest Service Center; and SAWS's newly appointed president and CEO, Robert Puente. McGervey investigated Martin's alleged misconduct with regard to the emails and then conferred with Ruiz. They recommended to Bailey that a Notice of Proposed Termination be issued against Martin. In a memo to Puente, Bailey asked for Puente's approval to issue the Notice of Proposed Termination because Martin "was involved in the distribution of sexually explicit material and attempting to interrupt the company-wide e-mail investigation." After Puente gave his approval, Mahan signed the Notice of Proposed Termination.

Although SAWS admits that there is some evidence that Bailey and Ruiz were aware Martin had filed reports with TCEQ, it emphasizes that McGervey, who was "hands on" in the investigation, testified that she did not know Martin filed a TCEQ complaint. However, there was evidence that she interviewed employees at the Northwest Service Center about Martin in April 2007 at a time SAWS general foremen and others at the Northwest Service Center began to treat Martin differently and openly discuss his filing a claim with TCEQ. Further, in investigating the alleged misconduct against Martin, there was evidence at trial that McGervey worked closely with Ruiz, who testified he was "aware as of July 2007 when I met Kevin, that he was going to do everything he could to push the [asbestos] issue." There is evidence that Ruiz attended at least three meetings between SAWS and TCEQ regarding the asbestos issue. Notes

from these meetings reflect that the following was discussed: (1) "Other locations will be coming," including "O'Connor"; (2) "Info request from Kevin could lead to class action lawsuit"; (3) Martin "will force" Medio Creek to remediation"; (4) "Kevin still calls 2-3 times/week"; (5) "Kevin does not see this moving to NOE – not referring to enforcement"; (6) "Letter coming on O'Connor – will follow same path"; and (7) "Kevin claims we [SAWS] are hiding materials." Additionally, there was evidence that Bailey, vice president of H.R., with whom McGervey and Ruiz conferred, had received an e-mail from his safety director that discussed Martin's complaints to TCEQ. From this evidence, the jury could reasonably conclude that people involved in making the decision to constructively discharge Martin knew that he had made a complaint to TCEQ.

There was also evidence at trial that SAWS at first fought the notice of violations and denied that the asbestos pipe had been handled and disposed of improperly. There was also evidence that the remediation process took an extended period of time. Although TCEQ began its investigation in January 2007, SAWS did not present a remediation plan that was approved by TCEQ until May 2010. And, as noted, there was evidence that Ruiz attended three meetings between TCEQ and SAWS where the discussions included that Martin would "force" the Medio Creek dump site to remediation; that Martin was calling TCEQ two to three times per week; that Martin had alleged SAWS was hiding its dumped asbestos materials; and that Martin's information requests to TCEQ could lead to class action lawsuits. Thus, there was evidence from which the jury could have reasonably inferred that SAWS was unhappy with Martin having filed the TCEQ complaint.

Additionally, there is evidence that it took SAWS a long time to conduct the investigation into Martin's alleged misconduct. McGervey testified that the purpose of placing Martin on

administrative leave in February 2008 was to conduct an investigation into whether Martin had improperly shown the pornographic emails to Zuniga on February 15, 2008. There was evidence that although McGervey completed her investigation by March 4, 2008, Martin's Proposed Notice of Termination was not issued until five and a half months later. There was also evidence presented at trial that five other employees who had been placed on administrative leave because of the email investigation were issued their Notices of Proposed Termination within a few days of being placed on administrative leave.

Additionally, there is evidence from which the jury could have reasonably concluded that SAWS's stated reasons for Martin's constructive discharge were pretextual. The Notice of Proposed Termination stated that Martin accompanied Garcia in January 2008 to SAWS Human Resources as Garcia's representative and was disruptive. However, there is evidence in the record that Martin merely handed Garcia's letter to a receptionist and sat with Garcia in the lobby. Martin never spoke to McGervey. Bailey, McGervey's boss and vice president of H.R., testified that there was nothing inappropriate with Martin accompanying Garcia to the lobby for moral support or carrying Garcia's written response to the H.R. receptionist.

The Notice of Proposed Termination also complained of Martin sharing confidential information concerning the email investigation. However, there was evidence at trial that Martin was not part of SAWS's investigative team; that he was asked by Ruiz to collect hard copies of inappropriate emails; and that the emails were not related to SAWS business and contained no confidential information about SAWS. Further, there was evidence that McGervey was improperly imputing actions and statements by other SAWS employees and former SAWS employees to Martin based on her interview notes. And, with regard to Martin allegedly interrupting Ruiz at the "all-hands meeting," there was testimony that Martin was not disruptive

or rude and that he did not interrupt Ruiz. Bailey testified that Martin's question about selective enforcement would be appropriate at an "all-hands meeting" as long as it was "stated correctly." And, there was evidence that Martin did not state his question in a rude or inappropriate manner. With regard to Martin showing the emails to Zuniga at the work site, Martin testified that Zuniga asked to see the emails and that Martin only complied with his superior's request. Further, Martin testified that he had the emails in his possession before the "all-hands meeting" because he knew the email investigation was going to be discussed at the meeting and that he later had them in his possession at the job site because he was waiting for Ruiz to call the meeting with other SAWS management. Thus, there was evidence from which the jury could have reasonably concluded that SAWS's stated reasons for Martin's constructive discharge were pretextual.

SAWS also argues that the lapse in time between Martin's filing of his complaint with TCEQ and the issuance of the Notice of Proposed Termination makes any inference of causation unreasonable. Martin filed his first complaint with TCEQ in January 2007. Ruiz learned Martin was the complainant in July 2007. And Martin filed his second complaint in October 2007. SAWS emphasizes that Martin's Notice of Proposed Termination was not issued until August 5, 2008. However, there was evidence presented at trial from which the jury could have reasonably inferred that the reason Martin's Notice of Proposed Termination was not issued until August 2008 was because SAWS was trying to place some distance between the termination of Martin's employment and Martin's filing of the TCEQ complaint. As noted, there was evidence from which the jury could have reasonably concluded that SAWS's stated reasons for Martin's termination were pretextual and that SAWS was unhappy with Martin filing the TCEQ complaint. Moreover, there was also evidence presented by SAWS at trial that one of the reasons it took so long to issue Martin's Notice of Proposed Termination was because Puente had been

newly appointed as CEO and was busy with learning his new position. Thus, we cannot conclude that the lapse in time between Martin's filing of his complaint with TCEQ and the issuance of the Notice of Proposed Termination makes any inference of causation unreasonable. We hold that the evidence is legally sufficient to support causation.

SAWS also argues that the evidence is factually insufficient to support "the finding that, but for Martin's reports to TCEQ, SAWS would not have issued the Notice of Proposed Termination to him when it did." SAWS argues that the "only evidence even potentially linking the Notice of Proposed Termination to Martin's TCEQ reports is the fact that Ruiz and Bailey were aware that those reports had been made." As noted above, there is much more evidence in the record to support the jury's finding of causation. SAWS also argues that the evidence is factually insufficient to support the finding that "SAWS would not have issued the Notice of Proposed Termination to Martin based solely on information, observation, or evidence that was not related to Martin's reports to TCEQ." SAWS argues that the overwhelming weight of the evidence in this case demonstrates that SAWS would have issued a Notice of Proposed Termination to Martin for reasons unrelated to his reports to TCEQ. We note that much of the evidence in this case was disputed. But, it was the jury's role as fact-finder to judge the credibility of the witnesses presented at trial and the weight to be given their testimony. *See McGalliard*, 722 S.W.2d at 696. In considering all the evidence, we cannot say that the jury's finding of causation is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. We therefore hold that the evidence is factually sufficient to support causation.

## COMPENSATORY DAMAGES

SAWS argues that the evidence is legally and factually insufficient to support the jury's award of past and future compensatory damages. The jury was asked to determine the amount of damages that would fairly and reasonably compensate Martin for his damages that resulted from SAWS's issuance of the Notice of Proposed Termination. The charge defined compensatory damages as including "emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-economic losses." The jury awarded Martin $110,334.68 for past compensatory damages and $55,172.34 for future compensatory damages. "Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress." *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011); *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). We must examine whether the record contains any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway*, 901 S.W.2d at 444; *see Lefton v. Griffith*, 136 S.W.3d 271, 279 (Tex. App.— San Antonio 2004, no pet.) (explaining that evidence a plaintiff "was unable to sleep, was depressed, and suffered from anxiety" does not rise to the level of compensable mental anguish as defined by Texas law). Here, Karnei and Jones testified that Martin was "worried" about being terminated because he filed a complaint with TCEQ. During his testimony, Martin was asked the following with respect to compensatory damages:

> Q:     Now, you were dealing with SAWS for – since January of 2007, and even before that in relation to your asbestos concerns. We had some testimony from Mr. Karnei and Mr. Jones about your concerns about your position as SAWS. What kind of effect did that have on you?
>
> A:     As far as emotional?

Q:      Well, you tell me.

A:      Well, it was strenuous. It was depressing, because I was trying to get SAWS to do the right thing.

Martin also testified that the stress made him "always bitter," that it "somewhat" disrupted his social interaction with his family; that he lost a lot of friends at SAWS because they did not want to be seen talking to him; and that he "had headaches." This evidence does not rise to the level of compensable mental anguish. *See Lefton*, 136 S.W.3d at 279.

The only other evidence in support of compensatory damages is Martin's testimony that he suffered from chest pains. According to Martin, the chest pains were at first believed to be a mild heart attack but it was later determine that he had not suffered from a heart attack, but something "closely related to one." SAWS argues that there is no evidence establishing any causal connection between these symptoms and any wrongful conduct by SAWS. SAWS emphasizes that there was no medical evidence in the record to establish such a causal connection and that Martin was not qualified to do so. Martin responds that his lay testimony is sufficient to establish a causal link because non expert evidence can be sufficient to support a finding of causation where the occurrence and condition are such that the general experience and common sense of lay persons are sufficient to evaluate the conditions and whether they were probably caused by the event. In *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010), the Texas Supreme Court explained that lay testimony can establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." However, it noted that the "general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Id.* We disagree with Martin that a causal relationship between something "closely related" to a heart attack and

SAWS's wrongful conduct is within the general experience and common sense of a layman. Moreover, even if lay testimony could establish such a causal link, here, Martin's testimony did not make such a connection:

> Q:      And where was this in the – in the scheme of things, as far as the stress level associated with your asbestos activities?
>
> A:      The dates?
>
> Q:      Well, if you know the dates, that would be fine.
>
> A:      Well, around 2008. And that's when I was first going to the VA, and then I believe in 2009, I went to a private doctor, Dr. Donavan.
>
> Q:      Okay. Did you have any other issues, stress related issues? How did it affect your family life?
>
> A:      Well, always bitter, and me and my wife [weren't] getting along too good. You know, we made it work, but – and my daughter too.
>
> Q:      Okay. What did the stress cause you as far as your relationship with your daughter and your wife?
>
> A:      Well, we're a close family. We do everything together. My daughter is in the AAU basketball. She's really gifted. We do a lot of training. We go out of state together. And she's – she's at 13 been verbally committed to one school, and that's quite an accomplishment. And to have me always on her, it was hard.

We therefore hold that the evidence is legally insufficient to support the jury's award of compensatory damages.

## CONCLUSION

We find the evidence legally and factually sufficient to prove causation; however, because there was no evidence to support an award of compensatory damages, we modify the trial court's judgment to delete all references to past or future compensatory damages. As modified, we affirm the judgment of the trial court.

Karen Angelini, Justice