**Reversed and Remanded and Memorandum Opinion filed May 21, 2013.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-12-00183-CV

_____

## MICHAEL GRAY, Appellant

## V.

## CITY OF GALVESTON, TEXAS, Appellee

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 10-CV-4432**

## M E M O R A N D U M   O P I N I O N

Michael Gray sued the City of Galveston claiming a violation of the Texas Whistleblower Act. The Act waives governmental immunity if a governmental entity takes adverse personnel action against a public employee who in good faith reports to an appropriate law enforcement authority a violation of law by another public employee. *See* TEX. GOV'T CODE ANN. §§ 554.002, 554.0035 (West 2012). The City filed a plea to the jurisdiction, and Gray contends the trial court erred by

granting the plea. We reverse and remand.

## I. PROCEDURAL BACKGROUND

Gray alleged in his petition that he was a lieutenant in the Galveston Police Department, serving as Commander of the Office of Professional Standards. He alleged that he "witnessed and became aware of criminal conduct by the Chief of Police of the Galveston Police Department, Charles Wiley." Gray reported Wiley's conduct "to an appropriate law enforcement agency, the Galveston County Criminal District Attorney." When Wiley became aware of the report, he transferred Gray from Gray's position as Commander of the Office of Professional Standards to the "detective division." Gray alleged, "This assignment constituted an adverse action."

The City filed a plea to the jurisdiction, arguing that Gray (1) did not make a good faith report of a violation of law; (2) was not subjected to adverse personnel action; and (3) did not exhaust administrative remedies under a collective bargaining agreement. The City attached and referenced excerpts from Gray's deposition and an affidavit from its expert, Michael Dirden. Appellant filed a response, and the trial court held a hearing. At the hearing, the trial court admitted into evidence the entire transcript from Gray's deposition and two letters that Wiley had sent to Gray.

The trial court granted the plea, and Gray appealed.

## II. ANALYSIS

Gray contends the trial court erred by granting the City's plea to the jurisdiction because he (1) made a good faith report of a violation of law; (2) suffered an adverse personnel action; and (3) exhausted administrative remedies. The City responds to the first two arguments but not the third.

## A.    Standard of Review

A court lacks jurisdiction if the government is immune from suit. *See City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010). We review jurisdiction de novo as a question of law. *Id.* When reviewing a trial court's ruling on a plea to the jurisdiction, we consider the plaintiff's pleadings and relevant evidence, construing the pleadings liberally in favor of the plaintiff. *Id.* The pleadings may not be conclusory and must include sufficient jurisdictional facts to determine if the trial court has jurisdiction. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction, the plaintiff should be afforded the opportunity to amend unless the pleadings demonstrate incurable jurisdictional defects. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

If the defendant challenges the existence of jurisdictional facts, the trial court and this court consider relevant evidence when necessary to resolve jurisdictional issues. *Id.* at 227. If the jurisdictional challenge implicates the merits of the plaintiff's case and the evidence creates a fact question, then a court cannot grant the plea to the jurisdiction. *See id.* at 227–28. "[T]his standard generally mirrors that of a summary judgment." *Id.* at 228. To survive a plea to the jurisdiction, a plaintiff is required "to show that there is a disputed material fact regarding the jurisdictional issue." *Id.* We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.*

## B.    Waiver of Immunity Under the Texas Whistleblower Act

To establish a waiver of governmental immunity under the Texas Whistleblower Act, a plaintiff must (1) be a public employee; and (2) allege a violation of the Act. *State v. Lueck*, 290 S.W.3d 876, 881 (Tex. 2009); *see* TEX.

3

GOV'T CODE ANN. § 554.0035. A governmental entity violates the Act if it "suspend[s] or terminate[s] the employment of, or take[s] other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE ANN. § 554.002(a); *see also City of Elsa*, 325 S.W.3d at 625.

The City does not dispute that Gray was a public employee; Wiley was another public employee; and the district attorney's office was an appropriate law enforcement authority. Thus, we must determine whether Gray's pleading or proof satisfied the requirements that he (1) in good faith reported a violation of law; and (2) was subjected to an adverse personnel action. We conclude that Gray has satisfied his burden on a plea to the jurisdiction.

### 1. Good Faith Report of a Violation of Law

The good faith requirement includes subjective and objective elements. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 320 (Tex. 2002). The subjective element requires that the employee believes he or she was reporting an actual violation of law. *Id.* The objective element requires that "a reasonably prudent employee in similar circumstances would have believed that the facts as reported were a violation of law." *Id.* The objective element "must take into account differences in training and experience" of the reporting individual. *Wichita Cnty., Tex. v. Hart*, 917 S.W.2d 779, 785 (Tex. 1996). "Thus, the reasonableness of a peace officer's belief that a law has been violated will be examined more closely than will the belief of one in another, non-law enforcement profession." *Harris Cnty. Precinct Four Constable Dep't v. Grabowski*, 922 S.W.2d 954, 956 (Tex. 1996) (finding no evidence of this element because the peace officer believed only that the other employee violated "his department's internal policies," and he

4

admitted he could think of no law the other employee violated).

"[A]n actual violation of the law is not required by the Whistleblower Act. The Act requires only a good-faith belief that a violation of law has occurred." *City of Elsa*, 325 S.W.3d at 627 n.3. An employee's "'report of an alleged violation of law may be in good faith even though incorrect . . . as long as a reasonable person with the employee's same level of training and experience would also have believed that a violation had occurred.'" *Mata v. Harris Cnty.*, No. 14-11-00446-CV, 2012 WL 2312707, at *3 (Tex. App.—Houston [14th Dist.] June 19, 2012, no pet.) (mem. op.) (quoting *Town of Flower Mound v. Teague*, 111 S.W.3d 742, 753 (Tex. App.—Fort Worth 2003, pet. denied)). Thus, "'when an employee believes and reports in good faith that a violation has occurred, but is wrong about the legal effect of the facts, he is nevertheless protected by the whistleblower statute.'" *Id.* (quoting *Tex. Dep't of Criminal Justice v. McElyea*, 239 S.W.3d 842, 850 (Tex. App.—Austin 2007, pet. denied)). There is no requirement that an employee have "'hard evidence to conclusively prove each and every element of a violation of the [law] prior to qualifying for whistleblower status.'" *Id.* (quoting *McElyea*, 239 S.W.3d at 853). "[A]n employee must have a good-faith belief that a law, which in fact exists, was violated." *City of Houston v. Cotton*, 171 S.W.3d 541, 547 n.10 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

First, we note that Gray's petition is conclusory and, therefore, deficient. Gray does not describe with any supporting facts the "criminal conduct" that he witnessed and reported to the district attorney's office, and he does not identify any law that Wiley allegedly violated. However, this is not the end of our inquiry on a plea to the jurisdiction. "Even though [Gray's] pleadings do not sufficiently allege jurisdictional facts, before his claim is dismissed for want of jurisdiction we will

5

look to the arguments and evidence the parties presented relevant to the existence of jurisdictional facts." *City of Elsa*, 325 S.W.3d at 625; *see also Cnty. of Bexar v. Steward*, 139 S.W.3d 354, 359 (Tex. App.—San Antonio 2004, no pet.) ("We note that [the employee's] failure to specify in his petition which particular provisions of the criminal statute the alleged conduct violated does not defeat jurisdiction over his claim.").

Gray testified at his deposition that he reported the crime of "official oppression," among other offenses.[1] He testified that in September 2010 he "witnessed Charles Wiley deny or impede the right of Robert Sanderson to his First Amendment." Sanderson was a police officer with the Galveston Police Department, and Sanderson told Gray that he intended to speak at a City Council meeting. Gray explained that Wiley "removed [Sanderson] from a Galveston City Council meeting," though Wiley did not use physical force. Gray witnessed Wiley tell Sanderson, "I'm tired of this GMPA crap. You are not to go and speak to Council unless you come and pass everything through me first."[2] Wiley did not say "in words" what would happen if Sanderson spoke to the City Council that day, but Gray believed there would be repercussions if Sanderson spoke to the City Council. He reached this conclusion because Wiley "turned very red, his voice was elevated, his eyes were wide, he was pointing, [and] he was very agitated." Wiley "looked very aggressive, very upset." Gray also testified, "Wiley was overheard telling the City Manager that, 'Don't worry about Sanderson, I threatened him.'"[3]

---

[1] The City's plea and the appellate briefing primarily focus on the alleged violation of law concerning official oppression. Gray also suggested Wiley's conduct amounted to witness tampering and coercion of a public servant.

[2] The GMPA is the Galveston Municipal Police Association.

[3] Gray did not witness this statement, but "it is permissible for a whistleblower's

6

Gray received a complaint from attorney Greg Cagle.[4] Cagle told Gray that Cagle believed Wiley had committed official oppression against Sanderson. Gray looked at the official oppression statute and reached the opinion that Wiley's conduct violated the statute. Gray then contacted Sanderson to confirm that Cagle was acting on Sanderson's behalf. Gray told Sanderson that if Sanderson "wished to file a complaint that he fill out the Galveston Police Department complaint form and turn it in to [Gray]."[5] Sanderson filled out the form and gave it to Gray. Gray then reported the alleged violation of law to the district attorney, Kurt Sistrunk.

Section 39.03 of the Texas Penal Code describes the offense of official oppression: "A public servant acting under color of his office or employment commits an offense if he . . . intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful[.]" TEX. PENAL CODE ANN. § 39.03(a)(2) (West 2011). The City argues that Gray's belief that Wiley violated this law is objectively unreasonable. The City notes that neither the City nor Gray has found a case in Texas in which a public official was prosecuted under this statute for conduct similar to Wiley's. Further, the City contends that there is no evidence of "any intent by the Chief to deny specific rights, including any theoretical right to free speech."

A prosecution for impeding a person's "right to free speech" appears possible under the statute from a plain reading. In *Jones v. Westergren*, the Corpus Christi Court of Appeals found that a district judge had "good cause" to conduct a

---

knowledge about violations of law to be based on hearsay." *McElyea*, 239 S.W.3d at 853.

[4] Cagle is representing Gray in this suit.

[5] Gray testified that part of his responsibility as Commander of the Office of Professional Standards (or "internal affairs") was to conduct or supervise others conducting investigations regarding allegations of misconduct of police officers in the Galveston Police Department.

7

court of inquiry proceeding to investigate whether a district attorney had committed official oppression. *See* 771 S.W.2d 669, 673 (Tex. App.—Corpus Christi 1989, orig. proceeding).[6] In particular, Judge Westergren testified by affidavit that he had good cause to believe that the district attorney had committed official oppression when the district attorney "intentionally denied and impeded one Bill Jensen and others in the exercise and enjoyment of the right of free speech to criticize in any manner however founded or unfounded, the operation of the office of the District Attorney." *Id.* at 672–73. Thus, a prosecution for official oppression by impeding the "theoretical right to free speech" seems plausible.

The City suggests it is "quite a proposition that a Chief of Police, the head of a paramilitary organization, cannot expect to be notified of his officer's conduct as a matter of course, without being accused of a quelling [sic] officers' First Amendment rights." Although a government may regulate its employees' speech to a certain degree, a police officer does not forfeit his or her First Amendment rights by serving in a "paramilitary organization." *See generally* Martin J. McMahon, Annotation, *First Amendment Protection for Law Enforcement Employees Subjected to Discharge, Transfer, or Discipline Because of Speech*, 109 A.L.R. FED. 9 (1992); 12B TEX. JUR. 3D *Constitutional Law* § 234 (2012). Whether Wiley ***actually*** impeded Sanderson's First Amendment right is a complex issue not determinable from this record. But Gray need not establish an actual violation of law; he need only allege and show with some jurisdictional evidence that his belief was reasonable under the circumstances. *See City of Elsa*, 325 S.W.3d at 627 n.3. A reasonably prudent person in Gray's position could have believed that Sanderson had a First Amendment right to speak in a public forum such as a city council meeting. *See Surita v. Hyde*, 665 F.3d 860, 866, 869–874

---

[6] The statute was subsequently amended to require "probable cause." *See* TEX. CODE CRIM. PROC. ANN. art. 52.01(b)(1) (West 2006).

8

(7th Cir. 2011) (denying qualified immunity on the plaintiff's First Amendment claim when the city's mayor prevented the plaintiff from speaking at a city council meeting until and unless the plaintiff met with the mayor and apologized to another city employee); *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009) ("[T]estimony before a city council might otherwise be just the sort of citizen speech protected by the First Amendment . . . ."); *Lindsey v. City of Orrick, Mo.*, 491 F.3d 892, 898–91 (8th Cir. 2007) (denying qualified immunity for the city's mayor based on a governmental employee's First Amendment claim when the employee was terminated after criticizing the city council at a city council meeting); *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1556–57 (11th Cir. 1995) (reversing trial court's JNOV on a fire chief's First Amendment retaliation claim because the chief's speech at city council meetings was protected under the First Amendment).

A government employer, including a police department, cannot rely upon an internal notification policy such as Wiley's if the policy would stifle an officer's First Amendment right. *Cf. Turner v. Perry*, 278 S.W.3d 806, 820–21 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (police department's policy requiring officers to "contact an AISD Police Supervisor prior to contacting any [assistant district attorney] for charges" could not be "applied lawfully to authorize adverse employment action" when the officer's speech was "protected by the First Amendment").

The City argues that there is no proof of Wiley's ***intentional*** denial of Sanderson's rights or that Wiley "knew his conduct was unlawful," as required by the statute. However, "[p]roof of a culpable mental state almost invariably depends upon circumstantial evidence," and a fact finder "can infer knowledge from all the circumstances, including the acts, conduct, and remarks of the accused

9

and the surrounding circumstances." *E.g.*, *Gant v. State*, 278 S.W.3d 836, 839 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The circumstances Gray was entitled to consider include that Wiley asked or ordered Sanderson to leave a City Council meeting at which Sanderson had intended to speak. Wiley told Sanderson that Sanderson was "not to go and speak to Council" unless Sanderson "pass[ed] everything through [Wiley] first." Although Wiley never identified specific consequences for Sanderson's noncompliance, Wiley "turned very red, his voice was elevated, his eyes were wide, he was pointing, [and] he was very agitated." Wiley looked "very aggressive." Gray could have reasonably believed that Wiley intended to impede Sanderson from speaking at the City Council meeting. Further, Wiley later allegedly told the City Manager to not worry about Sanderson because Wiley had "threatened him." From all of these circumstances, Gray could have reasonably believed that Wiley acted intentionally and knew his conduct was unlawful.

The City also suggests that Gray's report was "admittedly contrived with his own attorney." Although the City's interpretation may be a possible inference from the evidence, another inference is that it would be more reasonable for Gray to believe he was reporting a violation of law after an attorney had provided him an affirmative opinion on the matter. *See Teague*, 111 S.W.3d at 749–50, 753–54 (finding sufficient evidence that several police officers reported a violation of law with objective good faith in part because an assistant district attorney had advised the officers that the described conduct would be consistent with misdemeanor and felony violations).[7] We consider the conversation between Cagle and Gray as one

---

[7] *Cf., e.g.*, *United States v. Boyle*, 469 U.S. 241, 251 (1985) (noting that under some circumstances when an attorney advises a taxpayer on a matter of tax law, "it is reasonable for the taxpayer to rely on that advice"); *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1543 (Fed. Cir. 1992) (noting that in the defense of a claim of willful patent infringement, "reliance on competent counsel's opinion is evidence of good faith").

10

of many circumstances leading to Gray's reasonable belief that a violation of law had occurred, as we view the evidence in the light most favorable to Gray.

Upon reviewing the parties' trial and appellate briefing and the record evidence, we conclude that a reasonably prudent person in similar circumstances could have believed that the facts as reported were a violation of law, and the evidence raises a fact question on this jurisdictional issue. Thus, the trial court should not have granted the plea to the jurisdiction on this ground. *See City of Elsa*, 325 S.W.3d at 626.

### 2. Adverse Personnel Action

For purposes of the Texas Whistleblower Act, "'Personnel action' means an action that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation." TEX. GOV'T CODE ANN. § 554.001. In *Montgomery County v. Park*, the Texas Supreme Court adopted the United State Supreme Court's test for Title VII's retaliation provision to determine what constitutes "adverse personnel action" under the Texas Whistleblower Act. *See* 246 S.W.3d 610, 614–15 (Tex. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "[F]or a personnel action to be adverse within the meaning of the Act, it must be material, and thus likely to deter a reasonable, similarly situated employee from reporting a violation of the law." *Id.* at 612. The purpose of this standard is to allow claims based on retaliatory actions "likely to deter" reporting of governmental violations of law while weeding out "petty slights" and "minor annoyances." *Id.* at 614 (quotation omitted). Another goal is to bar trivial claims resulting from a plaintiff's unusual subjective feelings, but to allow claims arising from the particular circumstances of the challenged action. *Id.* at 614–15. The test accounts for the fact that an employer's action could be immaterial in some situations but material in others. *Id.* at 615. *Park* identified

11

some nonexclusive factors, including whether the alleged adverse personnel action negatively affected the employee's (1) prestige; (2) opportunity for advancement; (3) working conditions; (4) pay or income; or (5) ability to obtain outside employment. *See id.* But the court noted that "the presence or absence of any one of these factors is not dispositive." *Id.* Whether an action is adverse within the meaning of the Act is generally a question of law, although a fact finder must decide disputed issues of predicate fact. *Id.*

In his petition, Gray alleged that the transfer "from his position as Commander of the Office of Professional Standards to the Detective Division . . . constituted an adverse action." Gray also alleged that he, "a lieutenant, then reported to a Sergeant." This petition contains only a meager factual basis for determining whether he was subjected to adverse personnel action. We nonetheless look to the arguments of the parties and remainder of the jurisdictional evidence. *See City of Elsa*, 325 S.W.3d at 625.

On appeal, Gray contends he was subjected to adverse personnel action when he was reassigned from Commander of the Office of Professional Standards to the detective division, assigned to a sergeant, suspended with pay while he was being investigated for misconduct, and issued three written letters of reprimand; and he claims that he lost his ability to receive "on-call" pay and work an extra job at the "BP Claims Center." The City contends that (1) Gray waived and cannot rely on any alleged adverse personnel actions other than the reassignment, such as the written letters of reprimand and accompanying suspension with pay; (2) Gray's own evidence contradicts his allegations concerning his assignment to a sergeant and his abilities to receive on call pay or work an extra job; and (3) the reassignment and other personnel actions were not adverse as a matter of law.

First, we will review the evidence considered by the trial court. Next, we

12

address each of the City's contentions. We ultimately conclude that that under the totality of the circumstances, Gray's reassignment, reprimands, and suspension with pay would likely deter a reasonable, similarly situated employee from reporting a violation of law.

### a. The Evidence

Gray testified at his deposition that when he told Wiley about the report to the district attorney's office, Wiley said, "That's it, I have no faith in you anymore to command your division." Wiley told Gray to "clean out [Gray's] office and report to Captain [Heyse] for assignment in Investigative Services Bureau." Gray was immediately transferred to Financial Crimes Investigations in the Investigative Services Bureau. In a letter to Gray, Wiley wrote that the transfer was made "[b]ecause of your unprofessional and insubordinate actions." Wiley also wrote that in Gray's position as "Supervisor of Professional Standards and Internal Affairs, [Gray] reported directly to the Chief of Police." Wiley explained that Gray "necessarily had to and did serve as a confidant" to the Chief of Police concerning "overall oversight of departmental operations." Wiley wrote further, "In this role you had an unusually high level of access to me and my work, including participating in senior staff meetings, that other officers of equal rank, were not privileged to." Wiley confirmed that Gray's status as a "direct report" to Wiley allowed Gray "unfettered access to issues and matters necessitating the highest confidence between us."

Gray testified that he was "removed from a command position and put into an investigative position that could be held by an officer." Unlike the "investigative position" that could be held by an officer, the "command position" was at least a "sergeant position." He testified that after the transfer he was "assigned to a sergeant." Gray ranked his former position of Commander higher

than his then-current position of Assistant to the Chief.[8]  Regarding the desirability of the Commander position, Gray explained:

> I believe a professional in the law-enforcement area would be able to tell you the same thing, that your resume and your desirability for another agency, Federal agency, they would want you to be in a high-ranking or high-level administrative position where you are supervising and commanding a division.  And that would give you more experience and be better for your resume.

Gray also testified that within about three months of his transfer, he received three separate written letters of reprimand—"approximately 20 pages in [his] file." In his ten-year career in law enforcement, he had never before received a letter of reprimand.  One of the reprimands concerned Gray's investigation of Wiley.[9] During the City's investigation of Gray leading up to that reprimand, Gray was placed on a suspension with pay for four to five weeks.

Gray testified, "It damaged my career," and it caused "personal strain, stress, [and] lack of sleep."  He also explained, "It wouldn't be a wise choice to apply" for other law-enforcement jobs "when you have such letters in your background."  But he also explained that he had not looked for work outside the police department and he had no immediate plans to do so.  He testified that advancement within the Galveston Police Department was dictated by law under the civil service program only "up until lieutenant."  He testified that unnamed persons, in addition to Cagle, opined that the reprimands would have an actual effect on his career.

Gray testified further that as a result of the transfer and reprimands, he lost his ability to receive "on-call pay" and the ability to work an extra job—

---

[8] After Wiley retired or resigned from his position, Gray was made Assistant to the Chief.

[9] The reprimands are not part of the record.  Gray testified that one of the reprimands concerned an order he received "to delete files and destroy copies . . . about the investigative materials or the documents or recordings or anything that I had in reference to Charles Wiley and what I referred to the D.A.'s office."

specifically, the "BP Claims Center" job. Before the transfer, he received "on-call pay" and had worked the BP Claims Center job, which paid $30 per hour. Gray testified, however, that after the transfer he made no effort to obtain on-call pay, and other officers in the detective division received on-call pay. Further, although he had attempted to find other work in lieu of the BP Claims Center job, he could not identify any particular job and could not recall whether he in fact worked another job.

The City's expert, Dirden, opined that Gray's conduct of, among other things, initiating an investigation of the Chief of Police and removing files from the Office of Professional Standards contrary to a captain's orders, "reveals inadequate performance at best, and would properly serve as the basis for some form of discipline." Dirden believed that Gray's transfer was "entirely appropriate," though he also opined generally that an interdepartmental transfer "would not be an adverse employment action detrimental to any officer's career," and rather, an officer with experience in several areas "may be viewed as a 'better' officer by a supervisor or chief." Dirden also testified, "A reprimand is a minimal form of supervision for the conduct described and would not constitute discipline."

### b. Waiver

We hold that Gray did not waive his ability to rely on unpleaded adverse personnel actions. Evidence of reprimands, a suspension, and other issues were before the trial court, and the City addressed the reprimands in its plea to the jurisdiction. Gray's failure to reference conduct other than the reassignment in his petition does not incurably deprive the trial court of jurisdiction. *See City of Elsa*, 325 S.W.3d at 625–26. The only case cited by the City to support the waiver argument is inapt. In *Leonard v. Abbott*, 171 S.W.3d 451 (Tex. App.—Austin 2005, pet. denied), a vexatious litigant waived his ability to complain about the

trial court's dismissal "with prejudice" when he first raised the issue in an untimely supplemental motion for new trial. *Id.* at 461. *Leonard* did not concern the scope of review for a plea to the jurisdiction.

### c. Allegations Lacking Evidentiary Support

We disagree with the City that Gray's allegation of "reporting to a sergeant" has no support in the evidence. When discussing the letters of reprimand, Gray testified that he was "a lieutenant assigned to a sergeant." This testimony supports his allegation; although there is conflicting evidence in the record, we must view the evidence in the light most favorable to Gray.

However, we agree with the City that Gray's allegations concerning on-call pay and the BP Claims Center job do not support a conclusion of adverse personnel action. A reasonable employee would not be deterred from reporting a violation of law based on non-receipt of on-call pay that the employee never sought; nor has Gray shown that by not working the BP Claims Center job and failing to be "on-call," that he lost access to objectively equivalent extra work. *See Park*, 246 S.W.3d at 615–16 & n.9 (finding no adverse personnel action when the employee did not show that his former "security coordinator" position "allowed him to work more extra jobs than he would have without it"; there was no evidence that the employee "lost access to objectively equivalent extra work"). Gray could not even recall if he worked elsewhere at the time.

Accordingly, we do not rely on Gray's testimony concerning on-call pay and the BP Claims Center job in reaching our conclusion that Gray was subjected to adverse personnel action.

16

### d. Gray was Subjected to Adverse Personnel Action

We conclude that Gray's reassignment, reprimands, and suspension with pay amounted to adverse personnel action. The evidence discussed above concerning Gray's reassignment from a "command position" to an "investigative position," where he reported to an officer with a lower rank and no longer served as a "direct report" to the Chief of Police, supports a conclusion that Gray was transferred to a less prestigious position within the Galveston Police Department with a less significant role. *See id.* at 615 (identifying "prestige" as one factor to consider and finding no adverse personnel action when the plaintiff did not argue that the "loss of his security coordination responsibilities affected his prestige"); *see also Burlington*, 548 U.S. at 71 (finding sufficient evidence of adverse personnel action when the plaintiff's former position required more qualifications, which was "an indication of prestige").[10] This conclusion is not based on Gray's purely subjective belief or preference for one job over another. He testified that a law enforcement professional would say that being a commander makes the person a more desirable candidate for employment.

Before *Park* and *Burlington*, this court, relying on Fifth Circuit precedent, held that a supervisor's reprimand could not constitute an adverse personnel action as a matter of law for discrimination claims. *See Crye v. Rohmax USA, Inc.*, No. 14-02-01153-CV, 2003 WL 22724741, at *1 & n.7 (Tex. App.—Houston [14th Dist.] Nov. 20, 2003, no pet.) (mem. op.) (citing *Messer v. Meno*, 130 F.3d 130, 140 (5th Cir. 1997)).[11] However, *Burlington* overruled the "more restrictive

---

[10] Even if Gray had not been "assigned to a sergeant," but rather to a captain as the City suggests, it would still be undisputed that he was removed from a position reporting directly to the Chief of Police and thereafter reported to a captain.

[11] *See also Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 575 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997)).

approach" followed by the Fifth Circuit as it applied to retaliation claims. *See* 548 U.S. at 60.[12] By adopting the *Burlington* materiality standard for retaliation claims, *Park* necessarily dictates that our prior holdings about reprimands in *discrimination* cases are not controlling for determining adverse personnel actions in a *retaliation* case. Because we must consider all of the circumstances surrounding the alleged adverse personnel action, we will consider the fact that appellant received three written reprimands—"approximately 20 pages in [his] file"—which he had never before received during his career in law enforcement.

Further, after *Burlington*, the Fifth Circuit suggested that placing an employee on paid administrative leave could be evidence of adverse employment action in a retaliation case. *See McCoy v. City of Shreveport*, 492 F.3d 551, 560–61 (5th Cir. 2007).[13] The court observed that "placement on administrative leave may carry with it both the stigma of the suspicion of wrongdoing and possibly significant emotional distress. Instances of administrative leave can also negatively affect an officer's chances for future advancement." *Id.* at 561. In *Stewart v. Mississippi Transportation Commission*, the Fifth Circuit again noted that "[p]lacing an employee on paid administrative leave . . . cannot be said to be a 'petty slight.'" 586 F.3d 321, 332 (5th Cir. 2009). But that employee did not satisfy the *Burlington* standard in part because "[t]here was no suggestion that the leave was the result of any fault on Stewart's part, such as might carry a stigma in

---

[12] The Fifth Circuit had applied the "ultimate employment decision" standard for both discrimination and retaliation claims; *Burlington* clarified that the "ultimate employment decision" standard did not apply to retaliation claims. *See* 547 U.S. at 56–57, 60. *See generally McCoy v. City of Shrevport*, 492 F.3d 551, 559–561 (5th Cir. 2007) (discussing the difference between the test for discrimination and retaliation claims post-*Burlington*).

[13] The court "recognize[d] that it [was] at least a close question" but decided that it "need not answer this question today." *McCoy*, 492 F.3d at 561.

the workplace." *Id.*[14] Unlike in *Stewart*, Gray's administrative leave resulted from the City investigating him for misconduct, and he received a written letter of reprimand at the conclusion of the investigation. Accordingly, we will consider the fact that appellant was suspended with pay for over a month while the City investigated him for misconduct related to the Sanderson matter.

In arguing that Gray did not suffer an adverse personnel action, the City relies on Dirden's opinion testimony quoted above. Dirden opined generally about interdepartmental transfers and reprimands, and he testified that Gray's transfer was "appropriate." At best, Dirden's testimony would contradict Gray's testimony and the reasonable inferences to be drawn therefrom, and there is simply a fact question that must be resolved by a fact finder. *See Park*, 246 S.W.3d at 615 (noting that a "fact finder must decide disputed issues of predicate fact" concerning whether "a challenged action is adverse within the meaning of the Act").

For legal argument, the City relies exclusively on *Park* and several decisions from the Fifth Circuit, only one of which was issued after *Burlington*. Given that *Burlington* disapproved of the Fifth Circuit's earlier approach, we do not find the City's pre-*Burlington* cases particularly persuasive.[15] Further, Gray's case is not comparable to the *Park* case. The Montgomery County Sheriff's Department had

---

[14] Stewart was placed on paid administrative leave while the employer investigated her claims of misconduct by *another* employee. *Stewart*, 586 F.3d at 326.

[15] For example, *Pegram v. Honeywell, Inc.* followed the "ultimate employment decision" standard specifically rejected in *Burlington*. *See* 361 F.3d 272, 282 (5th Cir. 2004); *see also Burlington*, 548 U.S. at 67. That standard required an adverse personnel action to relate to decisions "such as hiring, granting leave, discharging, promoting, and compensating." *Pegram*, 361 F.3d at 282. Similarly, *Serna v. City of San Antonio* required the plaintiff to show that a transfer was "equivalent" to "discharges, demotions, refusals to hire, refusals to promote, and reprimands." 244 F.3d 479, 483 (5th Cir. 2001). And in *Lee v. City of New Orleans*, the court found that a police officer's transfer was not an adverse employment action because the officer did not establish that the transfer resulted in "loss of compensation, duties, or benefits." 156 F. App'x 618, 619 (5th Cir. 2005) (per curiam). The only test we apply is the one announced in *Burlington* and *Park*.

removed Park's duties as "security coordinator" for a convention center. *Park*, 246 S.W.3d at 612–13. Park argued that "as security coordinator he had the ability to assign himself extra jobs." *Id.* at 615. The Texas Supreme Court found no adverse personnel action because Park received no extra salary as the security coordinator and he made no showing that the position allowed him to work more extra jobs than he would have without it. *Id.* The court noted that Park did not argue that the loss of his responsibilities "affected his prestige." *Id.*

The City contends that another similar case is *Harrison v. Corrections Corp. of America*, a recent unpublished opinion[16] from the Fifth Circuit holding that an employee suffered no adverse personnel action when the employer reprimanded the employee and transferred him to a different department. 476 F. App'x 40, 44–45 (5th Cir. 2012). The employee testified that he had been "verbally counseled," had received "bad evaluations," and had been "reprimanded for misplacing a tool." *Id.* at 44. The employee testified that the reprimand was "fair," and the Fifth Circuit reasoned that a "reasonable employee would not be dissuaded by a reprimand and punishment he considered to be fair." *Id.* Thus, the verbal reprimands and generic bad evaluations were mere "trivial harms" under the *Burlington* standard. *Id.* at 44–45. The transfer was not an adverse personnel action because there was no record evidence showing that the new position offered fewer "opportunities for promotion or salary increases, involved a greater likelihood of termination, or the like." *Id.*

Gray, however, did not admit that his three written reprimands were fair, and *Harrison*'s holding about the transfer was based on the employee's failure to substantiate his particular appellate contentions with record evidence. *See id.*

---

[16] The opinion is "not precedent" according to the Fifth Circuit Rules. *See* 5TH CIR. R. 47.5.4.

*Harrison* cited with approval other Fifth Circuit opinions acknowledging that "'a lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances.'" *Stewart*, 586 F.3d at 332 (quoting *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008)). The Fifth Circuit found no adverse personnel action in *Stewart* based on an administrative assistant's reassignment from one supervisor to another in part because the employee's position, job title, and duties were unchanged, "and there [was] no evidence that she suffered a diminution in prestige." *Id.* The court reached the same result when a Wal-Mart cashier in the Tire Lube Express department was reassigned as a sales associate in the infant department. *Aryain*, 534 F.3d at 485. The court reasoned that there was no evidence that the sales associate position was viewed as less prestigious, and the employee admitted that she did not view the transfer as a demotion. *Id.* In Gray's case, as discussed above, the record evidence supports a conclusion that Gray was transferred to a lesser position. Further, in neither *Stewart* nor *Aryain* was the employee suspended due to allegations of misconduct or issued written reprimands in addition to the "lateral" transfer.

The reassignment in Gray's case is more similar to *City of El Paso v. Parsons*, 353 S.W.3d 215 (Tex. App.—El Paso 2011, no pet.). The El Paso Court of Appeals held that the evidence was legally and factually sufficient to support the jury's verdict that a firefighter was subjected to adverse personnel action by his "transfer to a less prestigious position" even though there was no reduction in his pay or change in his job title, and he received subsequent pay raises. *Id.* at 227–28. Parsons was the "Training Chief" for the City of El Paso's Fire Department training academy, where he performed a number of significant duties related to the training of firefighters. *See id.* at 218–19. After he reported a violation of law by his superiors, the Fire Chief transferred Parsons from the training academy to

21

headquarters. *Id.* at 221. Although he retained the title of "Training Chief" and received salary increases, his job responsibilities were substantially reduced. *See id.* The Fire Chief also issued a written reprimand concerning an unrelated incident, describing Parsons's conduct as "unprofessional and unacceptable." *Id.* at 223. After the Fire Chief retired, a new Fire Chief transferred Parsons back to the training academy where he resumed his more substantive duties. *See id.* at 224. The court of appeals held that the totality of the circumstances would allow a jury to conclude that Parsons was subjected to adverse personnel action within the meaning of the Act. *Id.* at 228.

Similarly, in *Kessler v. Westchester County Department of Social Services*, the Seventh Circuit held that Kessler presented sufficient evidence on summary judgment to create a genuine issue of fact concerning whether he was subjected to an adverse employment action based on a reassignment that operated as a "de facto demotion." 461 F.3d 199, 202, 210 (7th Cir. 2006). Kessler admitted that he was never disciplined, suspended, or written up; his salary, benefits, and hours of work were not decreased in any way; he never received an unsatisfactory evaluation; and his job title remained the same. *Id.* at 202, 205. However, after his transfer he was stripped of many of his earlier management responsibilities. *See id.* at 209. Whereas he previously had been "[u]nder the general direction of the Commissioner of Social Services or Deputy Commissioner, . . . he no longer reported to them but instead reported to a supervisor whose grade level was no higher than his." *Id.* Although he previously had functioned "as part of the top management of the Department," he no longer functioned in that role after his transfer and was required to perform lower-level work "alongside employees several grades below his." *Id.*[17]

_____

[17] Although *Parsons* and *Kessler* identified more significant evidence concerning the lack

Simply put, Gray was the commander of a division within the Galveston Police Department reporting directly to the Chief of Police. After the reassignment, he was no longer the commander of a division, and he reported to a sergeant or other officer of lower rank than the Chief. He was suspended with pay for over a month while he was investigated for misconduct, and he received three written letters of reprimand in his personnel file. These were not petty slights or minor annoyances. Gray's claim of an adverse personnel action is not trivial or based on subjective feelings. Accordingly, we hold that the City's actions would likely deter a reasonable, similarly situated employee from reporting a violation of law.

Gray has adduced sufficient evidence of his Whistleblower Act claim to overcome the City's plea to the jurisdiction. The plea should not have been granted on this ground. Gray's first and second issues are sustained.

## C.    **Exhaustion of Administrative Remedies**

Citing only *Gregg County v. Farrar*, 933 S.W.2d 769 (Tex. App.—Austin 1996, writ denied), in its plea to the jurisdiction, the City argued that the trial court lacked jurisdiction due to Gray's failure to exhaust administrative remedies.[18] However, this court, sitting en banc, specifically disagreed with *Farrar* and held that "it is clear that every deadline and procedure found throughout the Act is not jurisdictional." *Univ. of Tex. Med. Branch at Galveston v. Barrett*, 112 S.W.3d

---

of prestige of the reassignments, we are mindful of the stage of the current litigation—a plea to the jurisdiction—where Gray is not expected to prove his case simply to establish jurisdiction. *See Miranda*, 133 S.W.3d at 228 ("By requiring the state to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to 'put on their case simply to establish jurisdiction.'" (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (2000))).

[18] Specifically, the City argued that Gray failed to complete the fourth step identified in the collective bargaining agreement: arbitration.

815, 817, 818 n.23 (Tex. App.—Houston [14th Dist.] 2003) (en banc), *aff'd* 159 S.W.3d 631 (Tex. 2005). The Texas Supreme Court affirmed, stating that the Act "does not require that grievance or appeal procedures be exhausted before suit can be filed; rather, it requires that such procedures be timely initiated and that the grievance or appeal authority have 60 days in which to render a final decision." 159 S.W.3d at 632.[19]

The City has never argued that Gray failed to timely initiate the grievance procedure or wait the required 60 days; in fact, the City conceded that Gray "filed a grievance and pursued the initial three steps of his administrative remedies."[20] Accordingly, the City's plea should not have been granted on this ground.

Gray's third issue is sustained.

### III. CONCLUSION

Having sustained all of Gray's issues, we reverse the trial court's judgment and remand for further proceedings.


/s/      Sharon McCally
         Justice

Panel consists of Justices Christopher, Jamison, and McCally.

---

[19] The supreme court declined to address whether a failure to meet these requirements deprives the trial court of jurisdiction. *Barrett*, 159 S.W.3d at 622.

[20] The City did not address the exhaustion of administrative remedies issue in its brief on appeal.